FILED
OCT 30 2026
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 1:26 CR 00499 |
| TREY MICHAEL NOLTE, | ) | Title 18, United States Code, Sections 1028(a)(7) and (f), 1028A(a)(1), 1349, 1956(h), and 2 |
| Defendant. | ) | JUDGE FLEMING |

General Allegations

At all times material to this Information, unless otherwise specified:

1. Since 2003, the Democratic People's Republic of Korea ("DPRK" or "North Korea") has been under sanction by the United Nations ("UN") due to, among other things, its nuclear weapons program. Since 2016, the United States has likewise had comprehensive trade and economic sanctions against North Korea due to the national security threats posed by North Korea, including its nuclear weapons program. The sanctions effectively cut North Korea off from the U.S. marketplace and financial system and restricted the ability of U.S. persons and companies from doing business with DPRK institutions. As a result, North Korea has sponsored a variety of schemes to evade the U.S. and U.N. sanctions and earn money for the regime.

2. One such scheme involves the use of highly skilled information technology ("IT") workers to obtain remote, pseudonymous employment with companies around the world, including the United States, using false or stolen identities. According to a May 2022 advisory by the U.S. Department of State, the U.S. Department of the Treasury, and the Federal Bureau of Investigation ("FBI"), North Korea had dispatched thousands of IT workers around the world (hereinafter,

"overseas IT workers"), earning revenue that contributed to the North Korean weapons programs, in violation of U.S. and U.N. sanctions. These workers: (i) misrepresent themselves as foreign (non-North Korean) or U.S.-based remote workers using falsified or stolen identification documents (including U.S. driver's licenses and passports); (ii) obfuscate their location using virtual private networks ("VPNs"), virtual private servers ("VPS"), third country internet protocol ("IP") addresses, and proxy accounts; (iii) surreptitiously obtain remote IT jobs with companies spanning a range of sectors and industries around the world; (iv) develop applications and software for their employers; (v) in some instances, use privileged access gained through such employment for illicit purposes, including obtaining sensitive, proprietary information from an employer's computer network without authorization; and (vi) use U.S. financial institutions to funnel salaries paid by victimized companies to overseas accounts controlled by DPRK actors and their money laundering co-conspirators. While some of these IT workers operate from cities inside North Korea, many work in the People's Republic of China ("China") in cities near the North Korean border, including in Dandong and Shenyang.

3. In order to circumvent any controls that targeted U.S. and global companies have designed and implemented to prevent the hiring of illicit IT workers, and to otherwise prevent unauthorized access and damage to the companies' computer networks, the overseas IT workers obtain assistance from persons residing in the United States.

4. Among other things, these U.S. facilitators received and hosted multiple laptop computers and other hardware issued by U.S. victim companies at their residences in the U.S. Using login credentials provided to them by the overseas IT workers—and unbeknownst to and without authorization from the U.S. victim companies—the U.S. enablers then facilitated remote access to the laptops by the overseas IT workers either by downloading remote desktop software

to the computers, or by utilizing a hardware device designed to allow for remote access (often referred to as a keyboard, video, and mouse switch or "KVM" switch).

5. The U.S. facilitators also established accounts at U.S. banks and online money transfer services to facilitate the movement of money paid by U.S. victim companies to the overseas IT workers and other persons located abroad. In exchange for these and other services, the DPRK actors pay many U.S. facilitators a substantial fee. Most of the money generated by this scheme, however, was funneled to the overseas IT workers and their overseas co-conspirators.

6. From in or around 2019 until approximately July 2025, one group of overseas IT workers, along with defendant TREY MICHAEL NOLTE, other overseas co-conspirators, including those described below as CO-CONSPIRATORS 1 through 12 ("CC-1-12"), whose monikers and true identities are known to the United States Attorney, and domestic co-conspirators, including those described below as CO-CONSPIRATORS 13 through 15 ("CC-13-15"), perpetrated fraudulent scheme for the overseas IT workers to conduct remote work for U.S. companies. The scheme resulted in the transmission of false and misleading information to dozens of U.S. companies, U.S financial institutions, and U.S. government agencies, including the U.S. Department of Homeland Security ("DHS"), the Internal Revenue Service ("IRS"), and the Social Security Administration ("SSA").

7. Specifically, this group of overseas co-conspirators stole the identities of U.S. citizens; applied for and obtained remote jobs at dozens of U.S. companies; caused false and fraudulent employment verification information to be sent to DHS; received laptop computers and other hardware from U.S. companies; accessed, without authorization, the internal systems of the U.S. companies using remote desktop software or other means; and received millions of dollars from the U.S. companies, much of which was falsely reported to the IRS and SSA in the name of

the U.S. persons whose identities were stolen.

8. Overseas co-conspirators functioned as supervisors in a hierarchical role and directed NOLTE and at least three other U.S. persons domestic co-conspirator facilitators in the scheme. NOLTE, in turn, was at the top of the hierarchy of domestic co-conspirator facilitators.

9. Among other things, NOLTE and other U.S. facilitators received and/or hosted laptop computers belonging to U.S. victim companies at their residences so that the U.S. companies believed the overseas DPRK IT worker co-conspirators were located in the United States; facilitated remote access to the computers by the overseas DPRK IT worker co-conspirators by, among other things, downloading software to the computers without authorization from the U.S. companies or connecting the U.S. companies' computers to internet-connected KVM switches; created shell companies with corresponding websites and financial accounts, including Dark Falls LLC, to make it appear as though the overseas DPRK IT worker co-conspirators were affiliated with legitimate U.S. businesses; and established accounts at U.S. financial institutions and online money transfer services to receive money from victimized U.S. companies, much of which was subsequently transferred to overseas DPRK IT worker co-conspirators .

10. In exchange for the overseas DPRK IT worker co-conspirators' services, defendant NOLTE and other domestic co-conspirators in the U.S. collected substantial fees from those victim companies and sent that money, in part, to the overseas DPRK IT worker co-conspirators.

11. During the time relevant to the Information, NOLTE collected more than $320,000 in salaries sent to fraudulent or fictitious employees, and he was paid by overseas co-conspirators more than $20,000 of those illicitly obtained funds.

12. Defendant NOLTE acted knowing that the overseas DPRK IT worker co-conspirators were, in fact, not located in the United States, that the overseas DPRK IT worker co-

conspirators used false and/or stolen identities to gain employment as IT workers, and that the overseas DPRK IT worker co-conspirators were defrauding the U.S. companies.

13. The conspiracy perpetrated a massive fraud that impacted more than 70 U.S. companies, compromised the identities of more than 25 U.S. persons, caused false information to be conveyed to DHS, IRS, and SSA on dozens of occasions, generated approximately $3 million in revenue for the overseas DPRK IT worker co-conspirators, and caused U.S. victim companies to incur legal fees, computer network remediation costs, and other damages and losses. The victimized U.S. companies spanned multiple industries and were located across much of the United States, including in Massachusetts, California, New York, New Jersey, Florida, Georgia, Minnesota, Maryland, North Carolina, Illinois, Ohio, Virginia, Michigan, Texas, Arkansas, Minnesota, Pennsylvania, Washington, and the District of Columbia.

<u>The Co-Conspirators</u>

14. Defendant TREY MICHAEL NOLTE was a United States citizen residing in the Northern District of Ohio. NOLTE was the founder of an Ohio-based limited liability company, Dark Falls LLC, that purported to specialize in software development. In fact, Dark Falls LLC was a shell company used by NOLTE and his co-conspirators to facilitate the criminal scheme described in this Information. Among other things, NOLTE communicated with overseas DPRK IT worker co-conspirators and other overseas worker co-conspirators about the scheme via text message and email; sent packages containing electronics and other materials to Shenyang and Dandong, China, cities near the North Korean border, at the request of CC-1, an overseas DPRK IT worker co-conspirator whose monikers and true identity are known to the United States Attorney, received laptops belonging to U.S. victim companies at his residence addressed to persons whose identities had been stolen or fabricated; caused the laptops to be sent to the

residences of other domestic U.S. facilitators, including to personae using the actual names of P.B., V.J., N.M., and additional domestic U.S. facilitators, known and unknown to the United States Attorney, where they were remotely accessed by overseas IT workers; and received money from U.S. victim companies into bank and other financial accounts that he established and controlled, a significant portion of which he subsequently transferred to accounts owned and controlled by overseas co-conspirators.

15. CC-1 resided in Dandong City, China, a city near the border of North Korea, who, among other acts, registered multiple accounts with money transfer services ("MTS") and foreign banks that were used to receive and transfer proceeds generated through the conspiracy, including from NOLTE and other co-conspirators. CC-1 also functioned as a supervisor of overseas co-conspirators posing as employees and domestic co-conspirators facilitating the overseas worker scheme.

16. CC-2, whose monikers and true identity is known to the United States Attorney, resided in China. Among other things, CC-2 received packages in China shipped by NOLTE which contained, among other items, two laptops acquired from companies which had unknowingly hired overseas DPRK IT worker co-conspirators. CC-2 also functioned as a supervisor of overseas DPRK IT worker co-conspirators posing as employees and domestic co-conspirators facilitating the overseas IT worker scheme.

17. CC-3, whose monikers and true identity is known to the United States Attorney, was a Chinese citizen residing in China. Among other things, CC-3 registered MTS and foreign bank accounts that were used to receive and transfer proceeds generated through the conspiracy, including from NOLTE and other co-conspirators. CC-3 also functioned as a supervisor of overseas co-conspirators posing as employees and domestic co-conspirators facilitating the

overseas IT worker scheme.

18. CC-4, whose moniker and true identity is known to the United States Attorney, resided in China. Among other things, CC-4 received and transferred proceeds generated through the conspiracy, including to or from NOLTE and other co-conspirators.

19. CC-5, whose moniker and true identity is known to the United States Attorney, resided in China. Among other things, CC-5 received and transferred proceeds generated through the conspiracy, including to or from NOLTE and other co-conspirators.

20. CC-6, whose true identity is known to the United States Attorney, was a Chinese citizen residing in China. Among other things, CC-6 received packages in China shipped by NOLTE including, among other items, laptops acquired from companies which had unknowingly hired overseas members of the conspiracy.

21. CC-7, whose true identity is known to the United States Attorney, resided in China. Among other things, CC-7 registered MTS and foreign bank accounts that received and transferred proceeds generated through the conspiracy, including from NOLTE and other co-conspirators.

22. CC-8, whose moniker and true identity is known to the United States Attorney, was a Chinese citizen residing in China. Among other things, CC-8 received and transferred proceeds generated through the conspiracy, including to or from NOLTE and other co-conspirators.

23. CC-9, whose true identity is known to the United States Attorney, resided in China. Among other things, CC-9 registered MTS and foreign bank accounts that received and transferred proceeds generated through the conspiracy, including from NOLTE and other co-conspirators.

24. CC-10, whose true identity is known to the United States Attorney, resided in China. Among other things, CC-10 registered MTS and foreign bank accounts that received and transferred proceeds generated through the conspiracy, including from NOLTE and other co-

conspirators.

25. CC-11 whose true identity is known to the United States Attorney, resided in China. Among other things, CC-11 registered MTS and foreign bank accounts that received and transferred proceeds generated through the conspiracy, including from NOLTE. CC-11 also functioned as a supervisor of overseas co-conspirators posing as employees and domestic co-conspirators facilitating the overseas IT worker scheme.

26. CC-12 whose identity is known to the United States Attorney was of Nigerian citizenship and maintained a banking relationship with MTS-2. CC-12 functioned as a supervisor of overseas co-conspirators posing as employees and domestic co-conspirators facilitating the overseas IT worker scheme with other members of the conspiracy.

27. CC-13 was a resident of Ohio and a close friend of NOLTE who, in exchange for a fee, received and hosted U.S. victim company laptop computers at NOLTE's residence and facilitated the overseas IT workers' remote access to those laptops.

28. CC-14 was a resident of Pennsylvania who, in exchange for a fee, received and hosted U.S. victim company laptop computers at NOLTE's residence and facilitated the overseas IT workers' remote access to those laptops.

29. CC-15 was a resident of Texas, who in exchange for a fee, received multiple laptops mailed to CC-15's personal residence by NOLTE and used those laptops, and others, to host U.S. victim company laptop computers and facilitate the overseas IT workers' remote access to those laptop computers.

<u>Victim Banks and Financial Institutions</u>

30. At all times relevant to the Information, MTS-1 was a money transfer service that used the Internet to host its services, which included banking and money remittal transaction

support. MTS-1 clients registered accounts with their actual name, but then selected a username that MTS-1 linked both to a physical bank account and an email account.

31. At all times relevant to the Information, MTS-2 was a money transfer service that used the Internet to host its services, which included banking and money remittal transaction support.

32. At all times relevant to the Information, MTS-3 was a money transfer service that used the Internet to host its services, which included banking and money remittal transaction support.

33. At all times relevant to the Information, MTS-4 was a money transfer service that used the Internet to host its services, which included banking and money remittal transaction support.

34. At all times relevant to the Information, MTS-5 was a money transfer service that used the Internet to host its services, which included banking and money remittal transaction support.

35. At all times relevant to the Information, MTS-6 was a money transfer service that used the Internet to host its services, which included banking and money remittal transaction support.

36. BANK-1 was a United States-based bank with branches in the Northern District of Ohio, and which conducted business via electronic banking via web-based applications as well.

37. BANK-2 was a United States-based bank with branches in the Northern District of Ohio, and which conducted business via electronic banking via web-based applications as well.

38. BANK-4 was a United States-based bank with branches in the Northern District of Ohio, and which conducted business via electronic banking via web-based applications as well.

39. BANK-5 was a United States-based bank with branches in the Northern District of Ohio, and which conducted business via electronic banking via web-based applications as well.

40. BANK-9 was a China-based bank with branches in the Northern District of Ohio, and which conducted business via electronic banking via web-based applications as well.

41. BANK-10 was a United States-based bank with branches in the Northern District of Ohio, and which conducted business via electronic banking via web-based applications as well.

42. BANK-12 was a United States-based bank with branches in the Northern District of Ohio, and which conducted business via electronic banking via web-based applications as well.

43. At all times relevant to the Information BANKS-1-4, 5, and 9-12 were Federally insured banking institutions.

## COUNT 1
(Conspiracy to Commit Wire Fraud and Mail Fraud, 18 U.S.C. § 1349)

The United States Attorney charges:

44. The factual allegations contained in paragraphs 1 through 43 are realleged and incorporated by reference as if fully set forth herein.

45. From on or about February 1, 2019, to on or about January 21, 2026, in the Northern District of Ohio and elsewhere, the defendant, TREY MICHAEL NOLTE, conspired with others known and unknown to the United States Attorney to commit the following offenses:

a. wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343; and

b. mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did, for the purpose of executing and attempting to execute the scheme, knowingly cause to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

All in violation of Title 18, United States Code, Section 1349.

COUNT 2
(Money Laundering Conspiracy, 18 U.S.C. § 1956(h))

The United States Attorney further charges:

46. The factual allegations contained in paragraphs 1 through 43 are realleged and incorporated by reference as if fully set forth herein.

47. As described above, members of the conspiracy obtained payments from U.S. victim companies for IT work. Such payments were frequently made by Automated Clearing House ("ACH") transfers between banks and other financial services companies. After receiving

the money, members of the conspiracy wired or otherwise transferred all or most of it to bank accounts in China using the wires of the United States of America, China, and other countries.

48. From on or about February 1, 2019, to on or about January 21, 2026, in the Northern District of Ohio and elsewhere, the defendant, TREY MICHAEL NOLTE conspired with others known and unknown to the United States Attorney to:

(a) conduct, cause others to conduct, and attempt to conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire and mail fraud in violation of Title 18, United States Code, Section 1349, as described in Count One, with the intent to promote the carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

(b) conduct, cause others to conduct, and attempt to conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in such transaction represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud and mail fraud in violation of Title 18, United States Code, Section 1349, as described in Count One, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in

violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

(c) to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, Wire Fraud, in violation of Title 18, United States Code, Section 1343; Identity Theft, in violation of Title 18, United States Code, Section 1028; and, Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A, from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(d) to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds involving the proceeds of specified unlawful activity, that is, Wire Fraud, in violation of Title 18, United States Code, Section 1343; Identity Theft, in violation of Title 18, United States Code, Section 1028; and, Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A, from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing

that the transportation is designed in whole or part to avoid a transaction reporting requirement under state or federal law, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(ii).

All in violation of Title 18, United States Code, Section 1956(h).

COUNT 3
(Conspiracy to Commit Identity Theft, 18 U.S.C. § 1028(a)(7) and (f))

The United States Attorney further charges:

49. The factual allegations contained in paragraphs 1 through 43 are realleged and incorporated by reference as if fully set forth herein.

50. From on or about February 1, 2019 to on or about January 21, 2026, in the Northern District of Ohio and elsewhere, the defendant, TREY MICHAEL NOTLE did knowingly combine, conspire, and agree with other persons known and unknown to the United States Attorney to transfer, possess, and use, without lawful authority, in and affecting interstate and foreign commerce, the means of identification of another person, to wit, the names, Social Security numbers, dates of birth, and state issued driver's license and identification numbers, with the intent to commit, and to aid and abet, and in connection with, any unlawful activity that constitutes a violation of Federal Law, to wit, conspiracy to commit wire fraud and mail fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).

All in violation of Title 18, United States Code, Section 1028(a)(7) and (f).

COUNT 4
(Aggravated Identity Theft, 18 U.S.C. §§ 1028A(a)(1) and 2)

The United States Attorney further charges:

51. The factual allegations contained in paragraphs 1 through 43 are realleged and incorporated by reference as if fully set forth herein.

52. From on or about February 1, 2019, to on or about January 21, 2026, in the Northern District of Ohio and elsewhere, the defendant, TREY MICHAEL NOLTE did knowingly combine, conspire, and agree with other persons known and unknown to the United States Attorney to transfer, possess, and use, without lawful authority, in and affecting interstate and foreign commerce, the means of identification of another person, to wit, the names, Social Security numbers, dates of birth, and state issued driver's license and identification numbers, with the intent to commit, and to aid and abet, and in connection with, any unlawful activity that constitutes a violation of Federal Law, to wit, conspiracy to commit wire fraud and mail fraud in violation of Title 18, United States Code, Section 1349, and conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## FORFEITURE

The United States Attorney further charges:

53. Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One, the defendant, TREY MICHAEL NOLTE, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

54. Upon conviction of the offense in violation of Title 18, United States Code, Section 1956(h), set forth in Count Two, the defendant, TREY MICHAEL NOTLE shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property.

55. Upon conviction of the offense in violation of Title 18, United States Code, Section 1028(a)(7) and (f), set forth in Count Three, the defendant, TREY MICHAEL NOLTE shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1028(b)(5), any personal property used or intended to be used to commit the offense and, pursuant to Title 18, United States Code, Section 982(a)(2)(B), any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such offense

DAVID M. TOEPFER
United States Attorney

By: ______________________
Daniel J. Riedl
Chief, National Security Unit